# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAYSON DEL-MARCO WRIGHT, | 1:09-CV-01574 GSA HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT AND CLOSE CASE |
| GARY SANDOR, | ORDER DECLINING CERTIFICATE OF APPEALABILITY |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.  The parties have voluntarily consented to the jurisdiction of the magistrate judge pursuant to 28 U.S.C. § 636(c).

## BACKGROUND[1]

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, Hon. Gary Hoff presiding, following his conviction by jury trial on August 10, 2007, of conspiracy to commit identity theft (Cal. Penal Code § 182(a)(1)).  Allegations that Petitioner had suffered two prior serious felony convictions and that he had served a prior prison term pursuant to California's Three Strikes Law

---

[1] This information is derived from the state court records lodged by Respondent with his response and is not subject to dispute.

1

1    were found to be true.  Petitioner was sentenced to serve an indeterminate term of 25 years-to-life

2    in state prison.

3        Petitioner filed a timely notice of appeal.  On November 25, 2008, the California Court of

4    Appeal, Fifth Appellate District (hereinafter "Fifth DCA") affirmed Petitioner's judgment in all

5    respects.  He then filed a petition for review in the California Supreme Court.  The petition was

6    summarily denied on February 25, 2009.

7        On September 2, 2009, Petitioner filed the instant federal habeas petition.  He presents

8    the following four (4) claims for relief: 1) The evidence was constitutionally insufficient to

9    support the finding of two strike priors; 2) The trial court's findings that Petitioner's two prior

10   aggravated assault convictions were strikes violated his Fifth Amendment due process rights; 3)

11   He was denied his Sixth Amendment right to counsel when co-defendant's counsel elicited

12   inadmissible hearsay and opinion; and 4) Under the facts of this case, a sentence of 25 years-to-

13   life is cruel and unusual punishment.  On June 17, 2010, Respondent filed an answer to the

14   petition.  On August 16, 2010, Petitioner filed a traverse. He also filed a memorandum in support

15   of his traverse on September 16, 2010.

16                            **STATEMENT OF FACTS[2]**

17       The prosecution contended that appellant and Nicole Owens were part of an
     identity theft operation based upon evidence that was seized in an apartment occupied by
18   both defendants. Appellant contended that he was temporarily in the apartment and had
     slept on a couch in the apartment after having a fight with his wife, that he had nothing to
19   do with Owens's illicit activities, and that he was wrongly accused of the crimes. Owens
     likewise contended that appellant was not part of her operation.

20
     **Prosecution case**
21
         On December 5, 2006, the six officers and a sergeant assigned to the Fresno
22   Police Department's Parole Apprehension Team went to an apartment to locate and arrest
     appellant. Fresno Detective Andre Benson knocked on the door, and Nicole Owens
23   answered. When the officers asked for appellant, she lied and told them he was not
     present. After questioning, Owens admitted that appellant was in the bathroom. Detective
24   Benson commanded appellant to come out of the bathroom, and he complied. The
     officers saw certain incriminating evidence in plain view and proceeded to conduct a
25   search of the apartment. On a computer desk in the single bedroom, officers found several
     types of identification cards for people other than appellant and Owens. Appellant's
26   identification card was found among these items. Suspecting fraud or identity theft,

27   ───────────────

28       [2] The Fifth DCA's summary of the facts in its November 25, 2008, opinion is presumed correct. 28 U.S.C.
     §§ 2254(d)(2), (e)(1). Thus, the Court adopts the factual recitations set forth by the Fifth DCA.

1    Detective Benson contacted detectives with the financial crimes unit.

2         Detective Gregory Imirian, a member of the financial crimes unit, arrived at the
     apartment and met with Detective Benson. Detective Imirian identified the following
3    items in the apartment that he believed was consistent with identify theft: counterfeit
     driver's licenses, a computer scanner, a color printer, a laminator, and "butterfly"
4    laminating envelopes, a digital camera, a stolen credit card, small passport-type
     photographs of Owens and other unknown individuals, and several small scalpel-type
5    knives and blades.

6         The police found counterfeit identification cards bearing the photographs of
     appellant and Nicole Owens, but in the names of others. For example, they found a
7    counterfeit driver's license bearing Owens's photograph, but in the name of Michelle
     Wheelock. The officers also located several false identification cards bearing Owens's
8    photograph, but with Michelle Wheelock's personal identifying information. These cards
     were found in the bedroom. In the kitchen, the officers found a counterfeit driver's license
9    bearing appellant's photograph, but in the name of Joseph Beck. There was also a valid
     credit card in Beck's name located with the counterfeit driver's license.
10
          Officers also found several valid California driver's licenses in the bedroom,
11   including licenses belonging to Bobdrickus Clark, Jessica Johnson, and Jennifer Damont.
     A valid California identification card issued to Seloa Barajas Montez and an expired
12   driver's license belonging to Genice Harris were also located in the bedroom. An Aetna
     medical insurance card and a California medical benefits card for Jesus Villareal were
13   found in the kitchen.

14        The officers also located paperwork in the bedroom, bearing the names, dates of
     birth, social security numbers, driver's license numbers, and other personal information
15   for Michelle Entrocaso, Mark Antony Martino, Michael Jackson, and Roy Edward Bryan.
     Printed copies of California Department of Motor Vehicles (DMV) seals were found in
16   the bedroom.

17        Enlarged photocopied checks for Michelle Wheelock and Morgan Duffner also
     were found on the computer desk in the bedroom. The computer was loaded with a
18   "CheckSoft" program. Detective Imirian testified that this legal program can be used by
     forgers to create fraudulent checks. Check stock or stationary for printing checks was
19   found next to the computer.

20        Detective Imirian later questioned Owens. Owens told the detective that she
     created the counterfeit driver's licenses for others to assist them in passing forged or
21   fraudulent checks. In return, Owens received a portion of the proceeds. She explained that
     she was given the personal data information for Michelle Wheelock and Morgan Duffner
22   from a computer "hacker friend." She received the valid driver's licenses from another
     friend who wanted "fake ID's made."
23
          Bobdrickus Clark testified that his wallet containing his California identification
24   card was stolen from his wife's car around November 23, 2006. Clark did not know
     appellant and Owens, and he did not give them permission to possess his identification
25   card. Clark kept his recently-deceased mother's identification cards in his wallet for
     "sentimental reasons" because his mother did not like to take pictures of herself. Clark's
26   mother was Genice Harris.

27        A forensic examination of the hard drive from the computer in the bedroom
     revealed a Check Designer program and a file containing data on Michelle Wheelock and
28   a Wells Fargo Bank checking account. There were also scanned images of checks bearing

                                         3

1    Michelle Wheelock's name and signature. Several images of DMV seals of the type found
     on driver's licenses also were found in the hard drive. The images were initially scanned
2    onto the computer in October 2006 and last accessed on December 3, 2006. The police
     also found a file on the computer named "Dayson's folder" which contained a holographic
3    image of the back of a driver's license, DMV seals, and a blank driver's license template.
     Counterfeit driver's license images also were found in other files on the hard drive.
4
          A DMV manager confirmed the seized driver's license bearing Michelle
5    Wheelock's name was fraudulent because the license number was registered to another
     driver. Likewise, the driver's license bearing Joseph Beck's name was fraudulent because
6    the number was registered to someone else.

7    **Defense**

8         Appellant did not testify in his own defense. Instead, he relied on Owens's
     testimony that he was not involved in any identity theft activities, that he did not have a
9    key to the bedroom, and that he was not romantically involved with Owens.

10        Owens also testified that she told Detective Imirian that "it was my stuff and that
     [appellant] didn't even know that it [w]as in the house." Owens claimed that "Jaime," a
11   friend, brought the "stuff" to Owens's apartment as a way for Owens to make money if
     Owens was interested because Owens had been out of work for a couple of months and
12   was about to be evicted. Owens testified that she never used, or planned to use any of the
     false identification cards, checks, or credit card. She planned to return the items to Jaime,
13   or to throw them away if Jaime did not come back.

14        According to Owens, Detective Imirian was "more or less accusing [her] of stuff
     and trying to get [her] to say certain things" about an identity theft operation. Owens
15   claimed "[t]he majority of the stuff that he said in the report and stuff was blown out of
     proportion or twisted around and taken out of context." She denied telling the detective
16   that she agreed to take a portion of the proceeds from fraud. She also denied selling or
     making any fake identification cards. Instead, her friend Jaime showed her "how to do
17   that stuff." During some of the time that Jaime was using the computer and showing
     Owens, Owens was over helping neighbors with some stuff.
18
          When asked about the paperwork with other people's personal identification
19   information, Owens testified "I did have an ex-boyfriend who used to be involved in that
     type of stuff. I would assume he left it there. But I don't know whether it was him or
20   another friend that may have left it behind at my house." Owens claimed that she was not
     romantically involved with appellant. She knew him "for about a month or two before he
21   stayed at [her] house." She claimed appellant "wasn't aware of anything."

22        Owens claimed her friend Jaime made the false identification cards, including the
     one bearing appellant's photo and Joseph Beck's name. According to Owens, Jaime may
23   have used Dayson's photograph because Owens could not pass as Joseph Beck. When
     Owens saw that Jaime used appellant's photograph, she told Jaime that she did not want
24   appellant involved. With respect to the valid Target credit card in Beck's name, Jaime
     "had brought that over." Owens maintained appellant did not have access to her bedroom;
25   he slept on the couch. She had carried appellant's identification card when she took him to
     the hospital several days earlier and had left it with her purse in her bedroom when she
26   returned home.

27   **Rebuttal**

28        Detective Imirian testified that Owens "openly admitted to making the counterfeit

                                          4

1    drivers [*sic*] licenses...." Owens did say that friends had brought licenses to the house, but
2    Owens refused to identify her friends that were involved in the activity. Owens never
     mentioned "Jaime" or that "Jaime" brought over the fraudulent identification cards during
3    her interview.

4           According to a forensic computer examiner, an image of a California driver's
     license, California seal, and DMV hologram was found in a folder named "Dayson's
5    folder," created on August 25, 2006.

6    **Sub-rebuttal**

7           Owens testified that she let Jaime use her computer "sometime in August."

8    (See Resp't's Answer Ex. 1.)

9                                    **DISCUSSION**

10   I.     Jurisdiction

11          Relief by way of a petition for writ of habeas corpus extends to a person in custody

12   pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

13   or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

14   529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000).  Petitioner asserts that he suffered

15   violations of his rights as guaranteed by the U.S. Constitution.  The challenged conviction arises

16   out of the Fresno County Superior Court, which is located within the jurisdiction of this Court.

17   28 U.S.C. § 2254(a); 2241(d).

18          On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

19   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

20   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

21   F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

22   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct.

23   1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

24   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

25   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

     II.    Standard of Review
26
            The instant petition is reviewed under the provisions of the Antiterrorism and Effective
27
     Death  Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S.
28

63, 70 (2003). Under the AEDPA, a petitioner can prevail only if he can show that the state

court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at

1    409.

2         Petitioner has the burden of establishing that the decision of the state court is contrary to

3    or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

4    Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

5    states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

6    state court decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-

7    01 (9th Cir.1999).

8         AEDPA requires that we give considerable deference to state court decisions. "Factual

9    determinations by state courts are presumed correct absent clear and convincing evidence to the

10   contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a

11   factual determination will not be overturned on factual grounds unless objectively unreasonable

12   in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v.

13   Cockrell, 537 U.S. 322, 340 (2003).  Both subsections (d)(2) and (e)(1) of § 2254 apply to

14   findings of historical or pure fact, not mixed questions of fact and law.  See Lambert v. Blodgett,

15   393 F.3d 943, 976-77 (2004).

16   III.    Review of Claims

17        A.   Insufficiency of the Evidence

18        In his first ground for relief, Petitioner alleges there was insufficient evidence to support

19   the finding of two qualifying strike priors.  He claims the notation of "ADW" on the abstract of

20   judgment did not constitute proof beyond a reasonable doubt that the crime committed was an

21   assault with a deadly weapon.

22        Petitioner presented this claim on direct appeal to the Fifth DCA and California Supreme

23   Court.  Because the California Supreme Court's opinion is summary in nature, this Court "looks

24   through" that decision and presumes it adopted the reasoning of the California Court of Appeal,

25   the last state court to have issued a reasoned opinion. See Ylst v. Nunnemaker, 501 U.S. 797,

26   804-05 & n. 3 (1991) (establishing, on habeas review, "look through" presumption that higher

27   court agrees with lower court's reasoning where former affirms latter without discussion); see

28   also LaJoie v. Thompson, 217 F.3d 663, 669 n. 7 (9th Cir.2000) (holding federal courts look to

1  last reasoned state court opinion in determining whether state court's rejection of petitioner's

2  claims was contrary to or an unreasonable application of federal law under § 2254(d)(1)).

3       In denying Petitioner's claim, the appellate court stated as follows:

4       The strike convictions were decided by a court trial. To prove the prior strikes, the
        prosecutor presented the court with a 1991 probation report and a section 969,
5       subdivision (b) package containing certified copies of a chronological history, an abstract
        of judgment, two fingerprint cards, and photographs. The abstract of judgment indicates
6       appellant was convicted of two counts of "PC 245(a)(1)" "ADW." At sentencing, the trial
        court stated: "Although the court did receive during the bifurcated court trial on the priors
7       prior probation officers' reports, the 969B [*sic*] package in and of itself, which the court
        also received in evidence at that court trial sufficiently established that the defendant's
8       prior assaults were assaults with deadly weapons and not merely assaults by means of
        force likely to produce great bodily injury, and therefore, each of his felony assaults ... are
9       strike priors."

10      While Wright admits that an abstract of judgment is admissible to prove the
        nature of the offenses, see *People v. Banuelos* (2005) 130 Cal.App.4th 601, 606, he
11      contends that the notation "ADW" is not sufficient to prove that appellant committed
        assault with a deadly weapon as opposed to assault by another means likely to produce
12      great bodily injury. This is crucial because the three strikes law counts a prior conviction
        as a strike only if it is a violent felony or a serious felony. (See § 667.) For section 245,
13      subdivision (a) violations, only an assault with a deadly weapon is considered a serious
        felony, and thus a strike offense. (*People v.. Delgado* (2008) 43 Cal.4th 1059, 1065
14      (*Delgado*).) The People respond that the abstract of judgment is sufficient to establish that
        the section 245, subdivision (a)(1) violations were with deadly weapons, and that those
15      portions of the probation report that did not consist of defendant's statements were
        admissible to supplement the abstract of judgment. We agree that the abstract of
16      judgment was sufficient in and of itself to support the trial court's findings that appellant
        suffered two prior strike convictions.

17

18      In *Delgado,* the California Supreme Court held that an abstract of judgment with
        the notation "Asslt w DWpn" was sufficient for a trial court to find that the defendant
        committed a serious felony, and thus a strike violation. (*Delgado, supra,* 43 Cal.4th at p.
19      1065.) Here, the abstract of judgment containing the notation "ADW" was sufficient for a
        trial court to find that defendant committed the serious felony of assault with a deadly
20      weapon. Wright contends that *People v. Williams* (1996) 50 Cal.App.4th 1405, supports
        his argument that the notation "ADW" was too vague, but *People v. Williams* is
21      distinguishable from the present case. In *People v. Williams,* this Court held that a
        fingerprint card that designated a prior conviction as "ADW on P/O" was not sufficient to
22      support a finding of a strike conviction because there was no reasonable basis to conclude
        that the Department of Corrections employee who made the designation knew more about
23      the underlying conviction than the abstract of judgment that only stated "245(b) Ass
        Pea.Ofc" without reference to whether a deadly weapon was used. (*People v. Williams,*
24      *supra,* 50 Cal.App.4th at p. 1415.) However, this Court specifically noted that "the trial
        court's inference that the fingerprint card notation 'ADW' was a shorthand reference to
25      'assault with a deadly weapon' appears reasonable." (*Ibid.*) Here, the abstract of judgment
        stated "ADW," and the trial court properly conclude that it meant "assault with a deadly
26      weapon."

27      Wright also contends that *Delgado* is distinguishable because the standard of
        review in *Delgado* was sufficiency of the evidence whereas the standard of review in this
28      case is whether there is a reasonable probability that appellant would have had a more

1  favorable verdict had the trial court not considered the inadmissible evidence. However,
2  the trial court stated that the section 969, subdivision (b) package was sufficient in and of
   itself for the trial court to determine that the prior section 245, subdivision (a)(1)
3  violations were strike violations. Thus, even under the standard of review advocated by
   Wright, it was not reasonably probable that he would have had a more favorable sentence.
4  Therefore, we reject appellant's claim that the trial court erred in finding that his two prior
   section 245, subdivision (a)(1) convictions were strikes.

5  (See Resp't's Answer Ex. 1.)

6      Respondent correctly argues that Petitioner fails to state a basis for relief.  Applying state

7  law, the appellate court determined that the designation of "ADW" was properly found to denote

8  an assault with a deadly weapon pursuant to California's Three Strikes law.  Issues of state law

9  are not cognizable on federal habeas. Estelle v. McGuire, 502 U.S. 62, 67, (1991) ("We have

10  stated many times that 'federal habeas corpus relief does not lie for errors of state law.' "), *quoting*

11  Lewis v. Jeffers, 497 U.S. 764, 780 (1990); Gilmore v. Taylor, 508 U.S. 333, 348-49 (1993)

12  (O'Connor, J., concurring) ("mere error of state law, one that does not rise to the level of a

13  constitutional violation, may not be corrected on federal habeas").  As pointed out by

14  Respondent, the Supreme Court has not extended the protections of In re Winship, 397 U.S. 358

15  (1970), that due process requires proof of each element of a criminal offense beyond a reasonable

16  doubt, to proof of prior convictions used to support recidivist enhancements. Dretke v. Haley,

17  541 U.S. 386, 395 (2004), *citing*, Almendarez-Torres v. United States, 523 U.S. 224 (1998); see

18  also Apprendi v. New Jersey, 530 U.S. 466, 488-490 (2000) (reserving judgment as to the

19  validity of Almendarez-Torres); Monge v. California, 524 U.S. 721, 734 (1998) (Double

20  Jeopardy Clause does not preclude retrial on a prior conviction used to support recidivist

21  enhancement).   Petitioner has not demonstrated a violation of clearly established Supreme Court

22  precedent, nor has he shown that the state court's decision was an unreasonable determination of

23  the facts in light of the evidence.  The claim must be denied. See 28 U.S.C. § 2254(d).

24      B.   Double Jeopardy

25      Petitioner next alleges his Fifth Amendment constitutional right not to be held twice in

26  jeopardy for the same offense was violated when the trial court determined two prior convictions

27  constituted strikes pursuant to California's Three Strikes law.

28

1    This claim was also presented to the state courts on direct appeal.  The appellate court

2  rejected the claim as follows:

3       Finally, Wright contends in his supplemental opening brief that the trial court violated his
        constitutional right not to be held twice in jeopardy for the same offense when the trial
4       court found his prior conviction allegations true.  However, the state and federal double
        jeopardy provisions are not violated by retrial of a prior conviction allegation. (*People v.*
5       *Monge* (1997) 16 Cal.4th 826, 837; *Monge v. California* (1998) 524 U.S. 721;
        *Almendariz-Torres v. United States* (1998) 523 U.S. 224.)  As these cases have not been
6       overruled, they are binding precedents and thus, we reject appellant's claim. (*Auto Equity
        Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 452.)

7
   (See Resp't's Answer Ex. 1.)
8
        As discussed by Respondent, the state courts directly applied governing Supreme Court
9
   precedent in Monge v. California, 524 U.S. 721 (1998).  In Monge, the Supreme Court
10
   determined that "[a]n enhanced sentence imposed on a persistent offender [] 'is not to be viewed
11
   as either a new jeopardy or additional penalty for the earlier crimes' but as 'a stiffened penalty for
12
   the latest crime, which is considered to be an aggravated offense because a repetitive one.'" Id. at
13
   728, *citing*, Gryger v. Burke, 334 U.S. 728, 732 (1948).  Accordingly, habeas relief is
14
   unavailable. 28 U.S.C. § 2254(d).
15
        C.   Ineffective Assistance of Counsel
16
        Petitioner next argues counsel was ineffective in failing to object to inadmissible hearsay
17
   and lay opinion.  This claim was also raised on direct appeal and rejected by the state courts.  In
18
   the last reasoned decision, the appellate court stated:
19
            On appeal, Wright contends that he was denied his Sixth Amendment right to
20      counsel because his trial counsel failed to object to inadmissible hearsay testimony that
        fraudulent checks were actually used on the same date of the police investigation because
21      "[t]hat testimony filled a critical gap in the prosecution's case." According to Wright, the
        inadmissible hearsay discredited Owens's testimony that she decided not to participate in
22      an identity theft operation, which in turn discredited her testimony that appellant was not
        involved. Wright also contends that his trial counsel's belated attempt to exclude the
23      inadmissible hearsay testimony was ineffective because the trial court's admonishment to
        the jury about the inadmissible hearsay was ambiguous. In his supplemental opening
24      brief, Wright further contends that there was ineffective assistance of counsel when trial
        counsel failed to object to testimony by Detective Imirian that it was a crime to possess
25      another person's valid credit card without that person's permission under section 484e,
        subdivision (d), to counterfeit a state seal under section 472, and to possess a counterfeit
26      driver's license under section 470b because this testimony was irrelevant and inadmissible
        lay opinion.
27
            In order to prevail on a claim for ineffective assistance of counsel, Wright must
28      make two showings. First, he must show that counsel's representation fell below an

                                    10

1  objective standard for reasonableness under prevailing professional norms. (*Strickland v..*
   *Washington* (1984) 466 U.S. 668, 687-88; *People v. Gray* (2006) 37 Cal.4th 168, 206-
2  207.) Second, Wright must show that there is a reasonable probability that, but for
   counsel's unprofessional errors, the result would have been more favorable to the
3  defendant. (*Strickland v. Washington, supra,* 466 U.S. at p. 687; *People v. Kelly* (1992) 1
   Cal.4th 495, 519-520.) Here, Wright cannot prevail on his ineffective assistance of
4  counsel because there was no prejudice.

5          With respect to the inadmissible hearsay testimony that a counterfeit check was
   passed on the same date as the police investigation, there was no prejudice resulting from
6  the failure to object to that testimony because appellant could be convicted of conspiracy
   to commit identity theft pursuant to section 530.5, subdivision (a) even without the use of
7  the counterfeited checks. To be convicted of conspiracy, the prosecution must prove that
   appellant and Owens had the specific intent to agree to commit identity theft, as well as
8  the specific intent to commit the elements of section 530.5, subdivision (a), and one or
   both of them committed an overt act in furtherance of the conspiracy. (*People v. Morante*
9  (1999) 20 Cal.4th 403, 416.) Section 530.5, subdivision (a) prohibits the willful
   obtainment and use for unlawful purposes of personal identifying information. This Court
10 has held that one can violate section 530.5, subdivision (a), without having an intent to
   defraud. (*People v. Hagedorn* (2005) 127 Cal.App.4th 734, 741 .) Here, there was
11 substantial evidence to support the jury's finding that appellant and Owens agreed to
   commit identity theft and intended to willfully obtain personal identifying information
12 and use that information for an unlawful purpose. Appellant's picture was on a counterfeit
   driver's license that bore the name of another person. Appellant's identification card was
13 found in Owens's bedroom. The bedroom contained a computer that was used to create
   fraudulent checks, and that computer had a file called "Dayson's folder." Personal
14 identifying information belonging to other people was also located in the bedroom and
   kitchen. From this evidence, the jury could reasonably infer that appellant and Owens
15 agreed to commit identity theft, that they intended to willfully obtain personal identifying
   information, and that one of them committed an overt act in furtherance of the
16 conspiracy-here, the actual manufacturing of the counterfeit driver's licenses with their
   pictures but bearing the names of others. Whether a counterfeited check was actually used
17 is not a necessary requirement to prove the conspiracy charge. Moreover, the inadmissible
   hearsay testimony did not directly implicate appellant or Owens as someone else passed
18 the counterfeited checks since appellant and Owens had been arrested by the date of the
   police investigation. Thus, any error in failing to object to inadmissible hearsay testimony
19 that a counterfeited check was actually passed was not prejudicial.

20          With respect to the inadmissible lay opinion on what constitutes a crime, while
   that testimony is potentially irrelevant, there was no prejudice because the jury was
21 properly instructed on the elements of the crimes charged. Specifically, with respect to the
   conspiracy count, the jury was instructed that it could find appellant guilty if it found that
22 "[o]ne of the defendants, or an uncharged co-participant committed the alleged overt act
   of obtaining personal information of other persons and used the information to create
23 false identification documents or to create counterfeit checks." Thus, the jury was not
   instructed that it could find appellant guilty of conspiracy based upon an alleged overt act
24 of mere possession of counterfeited materials.

25 (See Resp't's Answer Ex. 1.)

26     The law governing ineffective assistance of counsel claims is clearly established.  Canales

27 v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus alleging

28 ineffective assistance of counsel, the court must consider two factors.  Strickland v. Washington,

1   466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9ᵗʰ Cir. 1994). First, the petitioner

2   must show that counsel's performance was deficient, requiring a showing that counsel made

3   errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth

4   Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation

5   fell below an objective standard of reasonableness, and must identify counsel's alleged acts or

6   omissions that were not the result of reasonable professional judgment considering the

7   circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9ᵗʰ Cir. 1995).

8   Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair

9   trial, one whose result is reliable. Strickland, 466 U.S. at 688. Judicial scrutiny of counsel's

10  performance is highly deferential. A court indulges a strong presumption that counsel's conduct

11  falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687

12  (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9ᵗʰ Cir.1994).

13         Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

14  reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

15  different," 466 U.S. at 694. A court need not determine whether counsel's performance was

16  deficient before examining the prejudice suffered by the petitioner as a result of the alleged

17  deficiencies. Strickland, 466 U.S. 668, 697 (1984). Since the defendant must affirmatively

18  prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

19         In this case, the appellate court determined that Petitioner was not prejudiced by counsel's

20  alleged failures. The state court specifically determined that, as a matter of state law, Petitioner

21  could be convicted of conspiracy without the evidence of the counterfeit check. The state court

22  noted that there was substantial evidence of specific intent to agree to commit identity theft apart

23  from the evidence of the counterfeit check. In addition, the counterfeit check evidence was weak

24  since it was cashed by another person and did not directly implicate Petitioner or his co-

25  defendant. Therefore, even without the counterfeit check evidence, there is no reasonable

26  probability the result would have been any different.

27         Moreover, as Respondent correctly notes, Petitioner's argument relies on the state court's

28  interpretation of state law and is therefore not cognizable on federal habeas review. Oxborrow v.

1    Eikenberry, 877 F.2d 1395, 1399 (9th Cir.), *cert. denied*, 493 U.S. 942 (1989) (Federal courts are

2    bound by state court rulings on questions of state law.).

3          With respect to Petitioner's claim that counsel failed to object to the inadmissible lay

4    opinion on what constitutes a crime, the state court reasonably determined there was no

5    prejudice.  As noted by the state court, although the lay opinion was irrelevant, the jury was

6    properly instructed on the elements of the charged offenses and jurors are presumed to abide by

7    such instructions from the court. Weeks v. Angelone, 528 U.S. 225, 234 (2000).

8          D.   Cruel and Unusual Punishment

9          Petitioner claims his sentence of 25 years-to-life pursuant to California's Three Strikes

10   law constitutes cruel and unusual punishment in violation of the Eighth Amendment to the

11   Constitution.

12         This claim was raised and rejected in the state courts.  The appellate court rendered the

13   last reasoned decision, as follows:

14         Cruel and unusual punishment is prohibited by the Eighth Amendment to the
     United States Constitution and article I, section 17 of the California Constitution.
15   Punishment is cruel and unusual if it is so disproportionate to the crime committed that it
     shocks the conscience and offends fundamental notions of human dignity." (*People v.*
16   *Mantanez* (2002) 98 Cal.App.4th 354, 358, fns. omitted.) There is "a three-point analysis
     for the determination [of] whether a sentence is cruel and unusual: (1) the nature of the
17   offense and the offender, with particular regard to the degree of danger which both
     present to society; (2) a comparison of the challenged penalty with the punishment
18   prescribed in the same jurisdiction for other more serious offenses [also called the
     intrajurisdictional analysis]; and (3) a comparison of the challenged penalty with the
19   punishment prescribed for the same offense in other jurisdictions [also called the
     interjurisdictional analysis]. [Citation.] It is not cruel and unusual punishment to enhance
20   the penalty for a crime because the defendant is a recidivist [citation] as long as the
     ultimate punishment, all facts considered, is not disproportionate to the crime.
21   [Citations.]" (*Id.* at p. 359.) When examining whether a punishment is cruel and unusual
     under the Eighth Amendment, if the "defendant's sentence does not give rise to an
22   inference of gross disproportionality, we need not conduct an intrajurisdictional and
     interjurisdictional analysis." (*People v. Romero* (2002) 99 Cal .App.4th 1418, 1428.)
23   Similarly, when evaluated under the California Constitution, the intrajurisdictional
     analysis "is inapposite to three strikes sentencing because it is a defendant's 'recidivism in
24   combination with his current crimes that places him under the three strikes law. Because
     the Legislature may constitutionally enact statutes imposing more severe punishment for
25   habitual criminals, it is illogical to compare [defendant's] punishment for his "offense,"
     which includes his recidivist behavior, to the punishment of others who have committed
26   more serious crimes, but have not qualified as repeat felons.' [Citation.]" (*People v. Cline*
     (1998) 60 Cal.App.4th 1327, 1338.) With respect to the interjurisdictional analysis, the
27   fact that California's three strikes law "is among the most extreme does not compel the
     conclusion that it is unconstitutionally cruel or unusual. This state constitutional
28   consideration does not require California to march in lockstep with other states in

fashioning a penal code. It does not require 'conforming our Penal Code to the "majority rule" or the least common denominator of penalties nationwide.' [Citation .] Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct." (*People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

In examining the first prong of the *In re Lynch* (1972) 8 Cal.3d 410 analysis, this Court "'consider[s] not only the offense in the abstract-i.e., as defined by the Legislature-but also "the facts of the crime in question." [Citation.] This entails an examination of the totality of the circumstances surrounding the commission of the offense in the case at bar, including such factors as its motive, the way it was committed, the extent of the defendant's involvement, and the consequences of his acts.' [Citations.] To assess the nature of the offender, we look at defendant's 'individual culpability in light of his age, prior criminality, personal characteristics, and state of mind.' [Citation .]" (*People v. Rhodes* (2005) 126 Cal.App.4th 1374, 1390.)

In *People v. Cooper* (1996) 43 Cal.App.4th 815, 825-826, this Court held that a 25-year-to-life sentence for a third strike criminal defendant found guilty of being an ex-felon in possession of a firearm does not constitute cruel and unusual punishment under the California Constitution. In *People v. Romero, supra,* 99 Cal .App.4th at page 1422, the Court of Appeal for the Fourth District concluded that a 25-year-to-life sentence for felony petty theft under the three strikes law is not cruel and unusual. In *Ewing v. California* (2003) 538 U.S. 11, 30-31, the United States Supreme Court held a sentence of 25 years to life in prison imposed for the offense of felony grand theft under the three strikes law is not grossly disproportionate and therefore does not violate the Eighth Amendment prohibition on cruel and unusual punishment. However, a recidivist sentence under the three strikes law for a nonviolent technical violation of a regulatory law is cruel and unusual punishment. (*People v. Carmony* (2005) 127 Cal.App.4th 1066.)

Here, the record shows that appellant was convicted of felony conspiracy to commit identity theft. Although a nonviolent offense, it is not a harmless technical violation of a regulatory law. Rather, felony conspiracy to commit identity theft is comparable to a conviction for being an ex-felon in possession of a firearm or for felony theft. Appellant's age does not assist him as he was 37 years old at the time of sentencing. The record also shows that appellant is a recidivist with a lengthy criminal history, beginning in 1984 when a wardship petition for felony theft was sustained. He committed a burglary and driving without a license in 1985. In 1989, he was convicted of aggravated assault and possession of a controlled substance in separate incidents. He was granted felony probation by the Madera County Superior Court, but he reoffended in 1990 by committing another aggravated assault in Fresno. Discharged from parole in 1996, he reoffended in 1999 and 2002 with misdemeanor offenses. In 2004, he was convicted of forgery as a third strike offender, but the trial court struck the allegations and sentenced him to three years in prison. In 2005, he was convicted of battery with serious bodily injury. In 2006, he was convicted of driving on a suspended license. He was released on parole in July 2006, and within several months he was arrested for the instant offense. His criminal history shows that he was violent in the past and had recently committed a crime of violence, battery with serious bodily injury, in 2005. It also shows that appellant was becoming involved in fraud crimes. Finally, his criminal history showed that he has not taken advantage of the leniency that was afforded to him a few years prior to committing the instant offense. Thus, we conclude that his sentence of 25-years-to-life for conspiracy to commit identity theft is not so grossly disproportionate that it constitutes cruel and unusual punishment.

(See Resp't's Answer Ex. 1.)

A criminal sentence that is not proportionate to the crime for which a defendant is

1  convicted may indeed violate the Eighth Amendment.  In Lockyer v. Andrade, 538 U.S. 63

2  (2003), the Supreme Court discussed the current state of Eighth Amendment proportionality

3  review and held that the only clearly established governing legal principle is that a "gross

4  disproportionality" review applies to criminal sentences for a term of years.  Id. at 72.  Citing

5  extensively to its past cases dealing with criminal sentencing and proportionality under the

6  Eighth Amendment, the Court acknowledged that it has "not established a clear and consistent

7  path for courts to follow."  Id.  The Supreme Court held that "the only relevant clearly

8  established law amenable to the 'contrary to' or 'unreasonable application of' frame work is the

9  gross disproportionality principle, the precise contours of which are unclear, applicable only in

10  the 'exceedingly rare' and 'extreme' case."  Id.[3]

11       In Ewing v. California, 538 U.S. 11 (2003), the Supreme Court again reviewed the

12  Supreme Court's Eighth Amendment jurisprudence, and chose to adopt Justice Kennedy's view[4]

13  that:

> [There are] four principles of proportionality review-- the primacy of the
> legislature; the variety of legitimate penological schemes; the nature of our federal
> system; and, the requirement that proportionality be guided by objective factors–
> that inform the final one: The Eighth Amendment does not require strict
> proportionality between the crime and the sentence.  Rather, it forbids only
> extreme sentences that are 'grossly disproportionate' to the crime.

14
15
16
17

Id. at 23.

18  In conducting a proportionality review of Ewing's sentence, the Court stated, "[i]n

19  weighing the gravity of Ewing's offense, we must place on the scales not only his current felony,

20  but also his long history of felony recidivism."  Id. at 1189-1190.  The Court noted that "any

21  other approach would fail to accord proper deference to the policy judgments that find expression

22  in the legislature's choice of sanctions."  Id. at 1190.  In imposing a Three Strikes sentence on a

23  recidivist criminal, the Court recognized the state's interest in dealing "in a harsher manner with

24

25        [3] The Court recognizes that other Supreme Court cases have dealt with cruel and unusual punishment.  See
26  Solem v. Helm, 463 U.S. 277 (1983); Rummel v. Estelle, 445 U.S. 263, 276 (1980).  However, these cases analyze
    cruel and unusual punishment in the context of recidivist statutes.  In this case, Petitioner was sentenced for her
27  current conviction.

28        [4]As expressed in his concurring opinion in Harmelin v. Michigan, 501 U.S. 957, 1001 (1991), *citing* Solem
    v. Helm, 463 U.S. 277, 288 (1983).

1  those who by repeated criminal acts have shown that they are simply incapable of conforming to

2  the norms of society as established by its criminal law." Id., *citing* Rummel v. Estelle, 445 U.S.

3  263, 276 (1980).  Accordingly, proportionality review must take this interest into account.  Id.

4  The Court held that Ewing's sentence of 25 years to life was justified by the State's public-safety

5  interest in incapacitating and deterring recidivist felons, and amply supported by Ewing's long,

6  serious criminal record.  Id.

7       In this case, the state court correctly applied clearly established Supreme Court precedent,

8  and the state court's conclusions were objectively reasonable as Petitioner's enhanced sentence

9  of 25 years-to-life was not grossly disproportionate to the offense of felony conspiracy to commit

10 identity theft. This crime was similar in seriousness to the level of the theft in Ewing. Moreover,

11 Petitioner was not only being punished for the instant offense.  He was being punished as a

12 recidivist for his lengthy criminal history which included several crimes of violence, the most

13 recent one being battery with serious bodily injury in 2005.  Notably, Petitioner had been granted

14 leniency once before on a forgery conviction in 2004; in that case, the trial court chose to strike

15 his prior qualifying strike allegations and sentenced him to three years in prison.  Given the

16 seriousness of the instant offense, Petitioner's lengthy criminal history, and his failure to benefit

17 from previous grants of leniency, Petitioner falls within the spirit of California's Three Strikes

18 law and his sentence does not give rise to an inference of gross disproportionality.  Petitioner

19 fails to demonstrate that the state court's decision was "contrary to, or involved an unreasonable

20 application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C.

21 § 2254(d)(1). The claim must be denied.

22 IV.    Certificate of Appealability

23      A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a

24 district court's denial of his petition, and an appeal is only allowed in certain circumstances.

25 Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003).  The controlling statute in determining

26 whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

27        (a) In a habeas corpus proceeding or a proceeding under section 2255 before a
          district judge, the final order shall be subject to review, on appeal, by the court
28        of appeals for the circuit in which the proceeding is held.

1

2      (b) There shall be no right of appeal from a final order in a proceeding to test the
validity of a warrant to remove to another district or place for commitment or trial
3      a person charged with a criminal offense against the United States, or to test the
validity of such person's detention pending removal proceedings.

4      (a)      (1) Unless a circuit justice or judge issues a certificate of appealability, an
appeal may not be taken to the court of appeals from–

5

6              (A) the final order in a habeas corpus proceeding in which the
detention complained of arises out of process issued by a State
court; or

7

8              (B) the final order in a proceeding under section 2255.

9      (2) A certificate of appealability may issue under paragraph (1) only if the
applicant has made a substantial showing of the denial of a constitutional right.

10      (3) The certificate of appealability under paragraph (1) shall indicate which
specific issue or issues satisfy the showing required by paragraph (2).

11

12      If a court denies a petitioner's petition, the court may only issue a certificate of

13   appealability "if jurists of reason could disagree with the district court's resolution of his

     constitutional claims or that jurists could conclude the issues presented are adequate to deserve
14
     encouragement to proceed further." Miller-El, 537 U.S. at 327; Slack v. McDaniel, 529 U.S. 473,
15
     484 (2000).  While the petitioner is not required to prove the merits of his case, he must
16
     demonstrate "something more than the absence of frivolity or the existence of mere good faith on
17
     his . . . part." Miller-El, 537 U.S. at 338.
18
         In the present case, the Court finds that reasonable jurists would not find the Court's
19
     determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or
20
     deserving of encouragement to proceed further.  Petitioner has not made the required substantial
21
     showing of the denial of a constitutional right.  Accordingly, the Court hereby DECLINES to
22
     issue a certificate of appealability.
23
     ///
24
     ///
25
     ///
26
     ///
27
     ///
28

17

1

**ORDER**

2       Accordingly, IT IS HEREBY ORDERED:

3       1) The petition for writ of habeas corpus is DENIED WITH PREJUDICE;

4       2) The Clerk of Court is DIRECTED to enter judgment for Respondent and close the

5   case; and

6       3) The Court DECLINES to issue a certificate of appealability.

7

8       IT IS SO ORDERED.

9   **Dated:**   **October 14, 2010**                    _/s/ **Gary S. Austin**_
                                            UNITED STATES MAGISTRATE JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28